UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Shellye M. Davis,<br>    *Plaintiff,*<br><br>    *v.*<br><br>City of Hartford, Hartford Public Schools, and<br>Patricia Phelan,<br>    *Defendants.* | Civil No. 3:06cv1596 (JBA)<br><br><br><br>March 11, 2009 |

**RULING ON MOTION FOR PARTIAL SUMMARY JUDGMENT**

This is an employment-discrimination action against the City of Hartford ("Hartford"), Hartford Public Schools ("HPS"), and Patricia Phelan, the principal of McDonough Middle School ("McDonough"). In the eight-count complaint, Plaintiff Shellye M. Davis asserts claims under 42 U.S.C. § 1983 against all three Defendants for discrimination, harassment, and retaliation; claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, against Hartford and HPS for racial discrimination in employment and retaliation; a libel claim against Phelan; and claims for negligent and intentional infliction of emotional distress against all Defendants.

The Defendants have moved for partial summary judgment on the § 1983 claims against Hartford and HPS, on the Title VII claims against Hartford,[1] and on the emotional-distress claims against all Defendants. For the reasons that follow, Defendants' motion is granted in part and denied in part.

---

[1] Davis now concedes that Hartford is not her employer and accordingly withdraws the Title VII claims against Hartford as alleged in counts three and four.

I.      Facts

For the purpose of this motion, the Defendants agree that the following facts as alleged in the complaint are undisputed.

Since 1991, Shellye Davis, an African-American female, has been employed by HPS as a paraprofessional (or teacher's aide).  Between June 2004 and June 2005, she worked at McDonough and was supervised by Phelan.  During this time period, Davis was subjected to discriminatory and hostile treatment and retaliation by Phelan because Davis reported racially discriminatory treatment of minority students by a white teacher at the school.  Phelan, who is also white, neither took action against the teacher nor stopped the teacher's abuse of minority students.  Rather, Phelan retaliated against Davis by prohibiting her from participating in cheerleading functions, refusing to grant her personal time off, and attempting to induce her to act in a way that would justify her termination.  After Davis filed a union grievance and a complaint with the Connecticut Commission on Human Rights and Opportunities, Phelan gave Davis a poor performance evaluation that contained false statements and threatened her with a negative annual evaluation.  In June 2005, the director of human resources for HPS, allegedly at Phelan's urging, transferred Davis from McDonough to Bulkeley High School.

Davis has submitted copies of letters she sent to other school officials, union management, members of the board of education, and the superintendent, in which she detailed her complaints of discrimination, harassment, and retaliation.  In her affidavit, Davis avers that the harassment consisted of the white teacher telling minority students that he slept with their mothers, telling Davis she was doing something improperly without knowing what Davis was doing, altering the heating and cooling of the room to make Davis

uncomfortable, and going through her belongings.  In addition, Davis asserts that Phelan asked her in the presence of the union president if she was able to read, asked her how she could afford to buy nice things and travel (suggesting that Davis was engaged in illegal activity to earn money), and screamed at Davis for getting the Department of Children and Families ("DCF") involved.

**II.     Standard**

Summary judgment is appropriate where the record after discovery "show[s] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue of fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, a moving defendant "need not prove a negative," but "need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'"  *Parker v. Sony Pictures Entm't, Inc.*, 260 F.3d 100, 111 (2d Cir. 2001) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). If "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," then there is an issue for trial and summary judgment must be denied.  *Anderson*, 477 U.S. at 249.  But if the evidence, viewed in the light most favorable to the nonmoving party, "could not lead a rational trier of fact to find for [that] nonmoving party, there is no genuine issue for trial," and summary judgment should follow. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quotation marks omitted).

**III.   Discussion**

Hartford and HPS argue that the § 1983 claims against them must be dismissed because Davis has not alleged and cannot establish the requirements for imposing municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978). The Defendants also contend that the emotional-distress claims are insufficient because the conduct Davis describes is not sufficiently extreme and outrageous.

**A.   Section 1983 Claims**

Hartford and HPS assert that Davis cannot establish that she was deprived of any constitutional rights pursuant to an official policy, practice, or custom of either Hartford or HPS. Because a municipality cannot be held liable under § 1983 on a theory of respondeat superior, they maintain that they are not liable for Phelan's conduct.

Hartford and HPS are correct that a municipality may not be held liable under § 1983 merely for employing a tortfeasor. *Monell*, 436 U.S. at 694. Rather, municipal liability may be imposed under *Monell* if the alleged constitutional violation is caused by an official policy or custom, which serves "to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986). In the absence of an explicitly adopted official policy or custom, municipal liability may still be imposed if the unconstitutional action is directed by an official who has final policy-making authority—not just discretion—with respect to the challenged act. *Id.* at 481–83. For such liability to attach, the official's unconstitutional actions must be within her area of policy-making authority. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988). As the Supreme Court explained more recently,

> in *Monell* and subsequent cases, we have required a plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal "policy" or "custom" that caused the plaintiff's injury. Locating a "policy" ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality. Similarly, an act performed pursuant to a "custom" that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law.

*Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 403–404 (1997) (citations omitted). A custom or practice may give rise to municipal liability if it is sufficiently "persistent or widespread" to constitute an official policy, or if it is "so manifest as to imply the constructive acquiescence of senior policy-making officials." *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 870–71 (2d Cir. 1992). But a plaintiff must point to "*deliberate* conduct" which shows that "the municipality was the 'moving force' behind the injury alleged." *Bd. of County Comm'rs*, 520 U.S. at 404.

Davis does not allege and offers no evidence that her constitutional rights were violated pursuant to any formal policy statement, ordinance, regulation, decision, practice, or custom that was officially promulgated or adopted by Hartford or HPS. Davis also does not argue that Phelan's acts represent official policy on the grounds that Phelan is a final policy-making official with respect to the areas of municipal business implicated by the adverse actions at issue. Indeed, Davis has no evidence and does not claim that Phelan had the requisite policy-making authority, either by virtue of legislative enactment or delegation to her by an official who possessed such authority, to set department-wide personnel policies in areas such as leave eligibility and employee transfers from school to school. To the contrary, Davis asserts that Phelan, as a school principal, had limited discretion in this

regard. In the Second Circuit, it is clear that mere discretionary authority is not sufficient to impose municipal liability for the conduct of a subordinate official without final authority. *Anthony v. City of New York*, 339 F.3d 129, 139 (2d Cir. 2003); *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000). Although Davis also references the director of human resources for HPS as having policy-making authority over school transfers, Davis has offered no evidence that this official had any authority over—or involvement in—the racially discriminatory conduct at McDonough which forms the basis of the § 1983 claims. Thus, as a matter of law, Davis has not sustained her burden of showing the existence of evidence on which reasonable jurors could impose municipal liability through the actions of policy-making officials.

Davis also offers no evidence to suggest that the type of discriminatory, harassing, and retaliatory conduct directed at her by Phelan was part of a widespread, persistent, and notorious practice so as to rise to the level of an informal municipal policy or custom. The record is bereft of evidence that Phelan's conduct was standard practice at the school. She has not cited any other instance, let alone a pattern or practice, in which municipal policy-making officials ignored and failed to investigate complaints of discrimination, retaliation, and harassment in Hartford schools. *See Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007) ("*Monell*'s policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions.").

Reduced to its essence, Davis's basis for imposing municipal liability focuses on only the circumstances of her particular case. With no evidence of the involvement of a policy-making official with final authority, or of a custom, policy, or pattern of misconduct, there

is no basis on which a jury could impose municipal liability. Thus, summary judgment must be granted on Davis's § 1983 claims against Hartford or HPS in counts two and five.

## B. Emotional-Distress Claims

Hartford, HPS, and Phelan also move for summary judgment on Davis's emotional-distress claims. They argue that the conduct Davis says caused her emotional distress falls far short of the atrocious and extreme behavior that is required for these causes of action. Count seven alleges negligent infliction of emotional distress against all Defendants, and count eight alleges intentional infliction of emotional distress against Phelan alone.

### 1. Negligent Infliction of Emotional Distress

Taking Davis's claim of negligent infliction of emotional distress first, summary judgment must be granted on this count for a reason not raised by the Defendants. In the employment context, a negligent-infliction claim under Connecticut law "arises only where it is based upon unreasonable conduct of the defendant in the termination process," and a plaintiff must demonstrate "that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that distress, if it were caused, might result in illness or bodily harm." *Parsons v. United Techs. Corp.*, 700 A.2d 655, 667 (Conn. 1997). "[A]n individual municipal employee may not be found liable for negligent infliction of emotional distress arising out of conduct occurring within a continuing employment context, distinguished from conduct occurring in the termination of employment." *Perodeau v. City of Hartford*, 792 A.2d 752, 762–63 (Conn. 2002).

Thus, because Davis remains employed by HPS, her negligent-infliction claim fails as a matter of law, and summary judgment is granted on count seven.

## 2.  *Intentional Infliction of Emotional Distress*

Turning to Davis's intentional-infliction claim, to prevail on such a cause of action under Connecticut law a plaintiff must prove that (1) the defendant intended to cause emotional harm, or knew or should have known that such harm was likely to result, (2) the defendant's misconduct was "extreme and outrageous," (3) such conduct caused the plaintiff's harm, and (4) the plaintiff's emotional harm was "severe." *Petyan v. Ellis*, 510 A.2d 1337, 1342 (Conn. 1986).  Put another way, liability can be imposed only for "conduct [which] exceed[s] all bounds usually tolerated by decent society," that is, "of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." *DeLaurentis v. City of New Haven*, 597 A.2d 807, 828 (Conn. 1991) (quotation marks omitted).  This standard for offensive conduct does not include, for example, "insults, verbal taunts, threats, indignities, annoyances, petty oppressions or conduct that displays bad manners or results in hurt feelings." *Miner v. Town of Chesire*, 126 F. Supp. 2d 184, 195 (D. Conn. 2000) (collecting cases).

In this case, the offensive conduct on which Davis bases her claims of emotional distress consists of Phelan's refusal to stop the white teacher's harassment of her and the minority students; Phelan's comment that she didn't "know how [Davis] could have ever been rated excellent"; Phelan's sarcastic question as to whether Davis could read; Phelan's statement implying that Davis "must be engaged in some illegal activity to earn money"; Phelan's poor evaluation of Davis and threat to give another negative evaluation in the future; Phelan's decision to evaluate Davis while all other paraprofessionals were evaluated by someone else; Phelan's screaming at Davis for prompting a DCF investigation against the other teacher; Phelan's involvement in transferring Davis to another school; and Phelan's

8

mistreatment of minority employees. (Davis Aff. ¶ 14.)

The Defendants argue that this conduct is insufficiently severe because it all falls within the category of unpleasant workplace behavior that Connecticut law deems not actionable. Quoting *Perodeau*, Defendants emphasize that "individuals in the workplace reasonably should expect to experience some level of emotional distress, even significant emotional distress, as a result of conduct in the workplace." 792 A.2d at 769. According to the Defendants:

> As the *Perodeau* Court pointed out, employees are sometimes accused unfairly, belittled, poorly evaluated, improperly transferred and the like. Such events are inherently stressful. Yet although unpleasant, rude, inappropriate, and even mean spirited, such behavior does not give rise to a cause of action for infliction of emotional distress in Connecticut.

(Defs.' Reply [Doc. # 44] at 8.) Defendants further cite other Connecticut appellate cases in which various examples of rude, profane, and insulting conduct failed, as a matter of law, to support liability for causing extreme emotional distress.

Whatever difficulty plaintiffs might normally encounter in making out emotional-distress claims arising out of conduct in the workplace, there is a limit to the mistreatment employees must endure before having grounds to seek redress in the courts. The frequently cited formulation from the Restatement instructs that actions are sufficiently extreme if members of the community, upon hearing a recitation of the facts, would resent the defendant and call his or her conduct "outrageous." Restatement (Second) of Torts, § 46 cmt. d (1965); *see also Appleton v. Bd. of Educ.*, 757 A.2d 1059, 1062 (Conn. 2000) (following the Restatement). On this record, the Court cannot find that no reasonable jury could reach just that conclusion about what Phelan did and said to Davis. Defendants are correct that some of the conduct Davis recounts falls short of being actionable in isolation—for example,

Phelan's failure to intervene to stop the teacher's classroom harassment and Phelan's negative evaluation and eventual transfer of Davis. But a jury could find that this was merely part of the larger context at McDonough. By Davis's telling in her affidavit, deposition testimony, and other correspondence, she was subjected to constant harassment targeted at her professional competence and socioeconomic status. Acting from a position of authority, Phelan publicly insulted Davis in highly personal ways, all while failing to act on Davis's complaints that a teacher was verbally abusing underperforming and minority children in Davis's presence. Phelan further utilized her authority as principal to take charge of supervising Davis herself, and in so doing gave Davis poor evaluations and later instigated her transfer. In addition, there is also evidence in the record—none of which is disputed by the Defendants at this stage—that Davis's documentation of her mistreatment at McDonough was stolen from her personal belongings inside a locked room, and that Phelan meddled in the school's investigation of that incident. Viewing these incidents in the aggregate, a jury could find that all this takes on new and more extreme meaning when considering that Phelan (the authority figure) is white and Davis (the harassed subordinate) is black. The Court cannot conclude that no jury could hear this evidence (if proved at trial) and find that Phelan's actions were outrageous.

Rounding out the remaining elements of an intentional-infliction claim, Davis has also offered evidence that she suffered extreme emotional harm as a result of this workplace harassment, and a jury could reasonably infer from Phelan's course of conduct that she was acting intentionally. As the moving party, Phelan has failed to carry her burden of showing that there is no disputed issue of material fact on this claim. Summary judgment must be denied on count eight.

**III.     Conclusion**

For the foregoing reasons, Defendants' Motion for Partial Summary Judgment [Doc. # 34] is granted in part and denied in part.  The Court grants summary judgment on the § 1983 claims against Hartford and HPS in counts two and five, on the Title VII claims against Hartford in counts three and four, and on the negligent-infliction claim against all Defendants in count seven.  Summary judgment is denied as to the intentional-infliction claim against Phelan in count eight.  All other claims remain for trial.

IT IS SO ORDERED.

_/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 11th day of March, 2009.